NOT FOR PUBLICATION                                    (Doc. Nos. 14, 19)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

———————————————————— :
                                              :
ADLER ENGINEERS, INC., et al.,                :
                                              :
              Plaintiffs,                     :
                                              :
       v.                                     :        Civil No. 14-921 (RBK/AMD)
                                              :
DRANOFF PROPERTIES, INC.,                     :            **OPINION**
                                              :
              Defendant.                      :
———————————————————— :


**KUGLER**, United States District Judge:

      This matter comes before the Court on the motion of Defendant Dranoff Properties, Inc.

("Defendant"), to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6) (Doc. No. 14), and Plaintiffs' cross-motion for leave to file a second

amended complaint (Doc. No. 19).  The subject of this action is Plaintiffs Adler Engineers,

Inc.'s, Adler Geoscience, Inc.'s, and Adler Associates, Inc.'s (collectively "Plaintiffs"), claims

for breach of contract, breach of the implied covenant of food faith and fair dealing, unjust

enrichment, and promissory estoppel filed against Defendant.   For the reasons stated herein,

Defendant's motion will be granted in part and denied in part and Plaintiffs' cross-motion for

leave to amend will be granted.

**I.      FACTUAL BACKGROUND**

      This action arises out Defendant's alleged breach of a contract for sale of real property

located in Camden, New Jersey.  (Amended Compl. ("Compl.") ¶ 1.)

Plaintiffs purchased property in Camden, located at 129 Market Street (the "Property"), in March 2000, for the purpose of developing it into office space.  (Id. ¶¶ 21-22.)  On the same block as the Property were several large surface parking lots, owned by the Camden Redevelopment Agency ("CRA").  (Id. ¶¶ 23-24.)  In order to obtain a mortgage to purchase the Property and the zoning approval necessary to operate offices out of the Property, the lending institutions and the Camden Zoning Board required Plaintiffs to obtain at least 54 parking spaces to be used by employees and guests.  (Id. ¶ 25.)  Before it closed on the Property, Plaintiffs entered into negotiations with the CRA to purchase 54 spaces in a parking lot adjacent to the Property.  (Id. ¶ 26.)  Despite its understanding with CRA, Plaintiffs were never able to purchase the 54 parking spaces.  (Id. ¶ 28.)  Apparently, CRA backed out of the sale of those spaces in order to sell them to Defendant, who was developing a property at 1 Market Street in Camden, New Jersey, one block over from the Property.  (Id. ¶¶ 29-30.)

The CRA's decision to sell the parking spaces to Defendant led to litigation between Plaintiffs and CRA, during the course of which Plaintiffs, Defendant, and the CRA entered into settlement negotiations.  (Id. ¶¶ 32-33.)  As a result of those negotiations, Defendant agreed to purchase the Property from Plaintiffs at its fair market price and Plaintiffs agreed to voluntarily dismiss their suit against the CRA.  (Id. ¶¶ 34-35.)  On or about October 3, 2007, Plaintiffs and Defendant executed an agreement of sale for the purchase of the Property (the "Contract").  (Id. ¶ 36; see Ex. A to Original Compl., Agreement for Sale and Purchase ("Contract").)

The Contract set forth the procedures that the parties were to adhere to in determining the purchase price of the property.  (Compl. ¶ 37.)  First, each party was required to retain its own real estate appraiser, who was to hold a Member, Appraisers Institute ("MAI") (or equivalent)

certification, and who would provide an appraisal of the Property.  (Id. ¶ 38; Contract ¶ 2(c)(i).)

The Contract also required that, during the appraisal process,

> Each party shall (A) provide to the other prompt written notice of
> its request for an appraisal and the identity of the appraiser
> selected; (B) cooperate fully, promptly and in good faith in
> connection with such appraisals; and (C) provide to the other party,
> a true, correct and complete copy of such appraisal within five (5)
> days of the receipt thereof

(Id. ¶ 2(c)(ii); Compl. ¶ 39.)  Once both were submitted, if the two appraisals for the value of the

Property were within 10% of each other, the sale price would be the average of the two

appraisals.  (Contract ¶ 2(c)(iii); Compl. ¶ 40.)  If the two appraisals differed by more than 10%,

however, then the original two appraisers were required to select a third MAI-certified appraiser

to provide a third appraisal of the Property.  (Id. ¶ 40; Contract ¶ 2(c)(iv).)  When the third

appraiser had submitted his or her appraisal, if all three appraisals did not differ by more than

15%, then the purchase price for the Property would be the average of all three appraisals.  (Id.;

see Compl. ¶ 41.)[1]  If any one of the three appraisals differed from the other two by more than

15%, then it would be discarded, and the average of the remaining two appraisals would be the

purchase price.  (Contract ¶ 2(c)(iv); Compl. ¶ 41.)  If all three of the appraisals differed from

each other by more than 15%, then the Purchase price was to be the average of the two appraisals

closest in amount to each other, and the third appraisal was to be discarded.  (Contract ¶

---

[1] Plaintiffs state in their Amended Complaint that the degree of acceptable difference between the appraisals could be 25%.  (Compl. ¶ 41.)  The express terms of the Contract state, however, that the degree of acceptable difference necessary to average all three appraisals was only 15%.  (Contract ¶ 2(c)(iv).)  Though a district court generally may not consider documents or matters outside the pleadings when ruling on a motion to dismiss, "a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  The Court notes that the plain language of the Contract contradicts Plaintiffs' description of its terms, yet Plaintiffs do not contest the validity or authenticity of the Contract or its terms.  As such, the Court will accept the "15%" number, articulated in the Contract, while describing the remaining relevant facts.  See Kutzin v. Pirnie, 124 N.J. 500, 507 (1991) ("Where the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and we must enforce those terms as written.")

2(c)(iv).)  In all circumstances, the purchase price was to be confirmed by written notice from the

Defendant to Plaintiffs and an Escrow Agent within five days of the submission of the appraisals.

(Contract ¶¶ 2(c)(iii)-(iv).)

In addition to the procedures described above, the purchase price portion of the Contract

contained the following term:

> The parties acknowledge that the determination of the Purchase
> Price in accordance with the foregoing subparagraph (c) is of the
> essence of this Agreement, and accordingly, the failure or refusal
> of a party to proceed as provided above or in a timely fashion and
> in good faith, shall be deemed to be a material breach of this
> Agreement and a default by such party, and shall entitle the other
> party to all rights and remedies for such material breach and
> default as are provided in this agreement.

(Id. ¶ 2(d); Compl. ¶ 42.)  In the event of a material breach and default by one party, the Contract

provided that

> If [Plaintiffs] shall not be in default hereunder, and [Defendant]
> shall fail or refuse to proceed with this Closing hereunder and/or
> fail or refuse to correct any default or breach by [Defendant] of this
> Agreement, then and in any such case, the Deposit shall be paid to
> [Plaintiffs] by [Defendant] as agreed upon liquidated damages for
> such breach, as [Plaintiffs'] sole remedy, or [Plaintiffs] at [their]
> option, may seek specific performance of this Agreement. …
>
> If [Defendant] shall not be in default hereunder, and [Plaintiffs]
> shall fail or refuse to proceed with the Closing hereunder and/or
> fail or refuse to cure any default or breach by [Plaintiffs] of this
> Agreement, [Defendant] shall be entitled to exercise all of its rights
> under this Agreement at law or in equity, and, without limiting the
> foregoing, shall have the option of:  (i) terminating this Agreement,
> in which event the Escrow Agent shall return the Deposit to
> [Defendant], this Agreement shall become null and void, and
> neither party shall have any further obligations hereunder; or (ii)
> demanding specific performance under this Agreement.

(Contract ¶ 17(a)-(b).)

Pursuant to the terms of the Contract, Plaintiffs and Defendant each retained an MAI-certified appraiser to determine the fair market value of the Property.  (Compl. ¶¶ 44-45.) Plaintiffs' appraiser initially appraised the Property at $1,820,000 on October 17, 2007, and Defendant's appraiser initially appraised the Property at $925,000 on November 9, 2007.  (Id. ¶ 46.)  Plaintiffs allege Defendant's appraisal was submitted late under the terms of the Contract, but as a sign of good faith they agreed to consider the appraisal as timely submitted.  (Id. ¶¶ 47-48.)[2]  Because the original two appraisals were more than 10% apart from one another, Plaintiffs' and Defendant's appraisers agreed to appoint a third-party appraiser, pursuant to the Contract.  (Id. ¶ 49.)  On January 30, 2008, the third-party appraiser appraised the Property at $1,275,000.  (Id. ¶ 50.)  At this point, all of the appraisals differed by more than 15%, and according to the terms of the Contract, the purchase price was to be determined by averaging Defendant's appraisal and the third-party appraisal, because these were the closest in amount to one another.  (See Contract ¶ 2(c)(iv).)[3]  This resulted in a purchase price of $1,100,000. (Compl. ¶ 51.)

---

[2] Plaintiffs also allege that they were "entitled to declare [their] own appraisal as the true fair market value of the Property," as a result of Defendant's appraisers late submission.  (Compl. ¶ 47.)  Plaintiffs ostensibly rely on the Contract in support of this allegation, yet, based on the terms of the Contract, the Court cannot find any language supporting this contention.  The Court need not address this issue in resolving the motion, but generally where the terms of the authentic document Plaintiffs rely on contradict their own assertions, the Court will consider both to determine the sufficiency of the allegations.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.")

[3] In Plaintiffs' Complaint, Defendant's Brief, and Defendant's Reply, the parties consistently state that because Plaintiffs' appraisal differed from the others by more than 15% the purchase price was to be determined by averaging Defendant's appraisal and the third-party appraisal.  (See Compl. ¶ 51; Def.'s Br. at 3-4; Def.'s Rep. at 4.) Though the result reached is ultimately the same, and the issue is not vital for the resolution of this motion, the Court notes that the terms of the Contract differ from the parties' assertions concerning why Defendant's appraisal and the third-party appraisal were to be averaged to determine the purchase price, as none of the three appraisals was within 15% of the others according to the appraisal amounts set forth in the Amended Complaint, and such a situation was apparently governed by another term in paragraph 2(c)(iv) of the Contract.

While the Contract terms are unclear concerning whether the amount of acceptable difference was calculated with respect to the higher or lower numbers, in any event, 1,820,000 is either 97% more than 925,000 or 925,000 is 49%

Allegedly the $1,100,000 amount was "never confirmed" by Plaintiffs because, after the three appraisals were submitted, Plaintiffs' realtor noted that every appraiser had omitted significant facts in his respective appraisals, including the fact that Plaintiffs had recently received a full price written offer of $1,500,000, and that a comparable property had recently sold for $161 per square foot.  (Id. ¶¶ 52-53.)  Plaintiffs claim they would have been willing to accept the $1,100,000 amount for the Property, "had it been based on accurate information."  (Id. ¶ 54.)  Instead of confirming the amount, Plaintiffs requested that the appraisers revise their reports in light of the additional information noted by Plaintiffs' realtor.  (Id.)  At this suggestion, Plaintiffs' appraiser and the third-party appraiser agreed to recalculate their appraisals, which resulted in a $1,285,000 appraisal from the third-party appraiser and a $1,500,000 appraisal from Plaintiffs' appraiser.  (Id. ¶ 55.)  Defendant, however, refused to correct its initial appraisal of $925,000, despite, Plaintiffs allege, the fact that the Contract "required all appraisers to fully cooperate with both parties."  (Id. ¶ 56.)  According to Plaintiffs, based on Plaintiffs' and the third-party's revised appraisals, Defendant's appraisal should have been discarded because is deviated "from the average of [the third party's and Plaintiffs' appraisals] by more than 25%" and thus, the purchase price of the Property should have been $1,392,500, the average of Plaintiffs' and the third-party's revised appraisals.  (Id. ¶ 57.)[4]

---

less than 1,820,000, 1,820,000 is either 53% more than 1,275,000 or 1,275,000 is 30% less than 1,820,000, and 1,275,000 is either 38% more than 925,000 or 925,000 is 27% less than 1,275,000.  Based on these numbers, according to the Contract, the purchase price still should have been determined by averaging Defendant's appraisal of $925,000 with the third-party appraisal of $1,275,000.  However, this is because all of the appraisals differed by more than 15%, and the difference between Defendant's and the third-party's appraisals was less than the difference between Plaintiffs' appraisal and either of the other two appraisals.  (See Contract ¶ 2(c)(iv).)  This leads to the same result reached by the parties, but apparently for a different reason.

[4] Again the Court notes that Plaintiffs' description of the method by which the purchase price was to be determined under the Contract and the actual terms of the Contract vary.  As noted supra at note 3, Defendant's original appraisal varied by more than 15% from both Plaintiffs' and the third-party's appraisals.  With the revised appraisals, Defendant's appraisal sill varied from the new appraisals by more than 15%.  Plaintiffs' and the third-party's revised appraisals differed by either 14 % (1,285,000 is 14% less than 1,500,000) or 17% (1,500,000 is 17% more than 1,285,000).  Using these new appraisals, they were either within 15% of each other and the purchase price

Defendant considered Plaintiffs' request for revised proposals as a sign of bad faith.  (Id. ¶ 62.)  On February 20, 2008, Defendant's counsel sent an email to Plaintiffs' counsel stating that Plaintiffs' request for revised appraisals "constitutes a willful, bad faith attempt to interfere with contractual arrangements which were very carefully negotiated and documented respecting the determination of the purchase price for the subject property."  (Id.; Ex. B to Compl., Julian Rackow Email.)  In that email Defendant's counsel also stated that Plaintiffs' "inappropriate attempt to influence the appraiser and the Appraisal constitutes actions in bad faith and in breach of the [Contract]," and based on its view that Plaintiffs acted in bad faith, Defendant terminated the Contract.  (Id.; Compl. ¶¶ 63-64.)

Plaintiffs claim they acted in good faith by requesting that the appraisers revise their appraisals, and were not attempting to manipulate the appraisal process.  (Id. ¶¶ 58, 65.)  This is supposedly evidenced by the fact that Plaintiffs' appraiser actually reduced the value of the property in his revised appraisal, and Plaintiffs only requested the revised appraisals to "remedy errors contained in the initial reports" and "come to an accurate valuation of the Property based on all the data," not to increase the purchase price of the Property.  (Id. ¶ 59-61.)  In fact, Plaintiffs claim they would have even accepted the $1,100,000 valuation that omitted the considerations in the revised proposal, but was never given the chance to because Defendant terminated the Contract and refused to either discuss the matter further or give Plaintiffs the opportunity to cure any alleged defaults.  (Id. ¶ 66.)  According to Plaintiffs, the Property is now worth significantly less than the purchase price appraisals made in 2008, and despite Plaintiffs'

---

would be the average of the two, or they were more than 15% apart from one another but the purchase price would still be calculated by averaging the two, because the difference between the two revised appraisals is less than the difference between either of those two appraisals and Defendant's original appraisal.  In other words, while the reasons Plaintiffs supply for how they arrived at the revised purchase price are seemingly inconsistent with the terms of the Contract, the amount they arrived at, $1,392,500, would be consistent with the terms of the Contract if in fact Plaintiffs' conduct was appropriate under the Contract.  This, and the instance noted supra at note 3, are instructive examples of why primary school math teachers continue to say to their students, "show your work."

best efforts, they have been unable to sell the Property due to its lack of parking spaces.  (Id. ¶ 77.)

Plaintiffs claim Defendant never actually wanted to purchase the Property, but had only agreed to do so in order to purchase the other properties on the block, as it would not have been able to purchase those properties without agreeing to purchase the Property under the terms of the Contract.  (Id. ¶¶ 67-69.)  Because it did not wish to purchase the Property, Plaintiffs allege Defendant relied on pretense to terminate the agreement, despite the fact that there was no indication that Plaintiffs acted in bad faith.  (Id. ¶¶ 70-71.)  According to Plaintiffs, even if they did act improperly, Defendant was obligated under the Contract to give them the opportunity to cure any default before it terminated the agreement, such as providing Plaintiffs the opportunity to cure the alleged default by demanding Plaintiffs accept the $1,100,000 appraisal value (Id. ¶¶ 72-73.)  Yet, Defendant gave no such opportunity, and refused to discuss the matter further.  (Id. ¶ 75.)  In doing so, Plaintiffs contend that it was Defendant, not Plaintiffs, that acted in bad faith "by using the flimsiest of pretenses to avoid purchasing a building that it only reluctantly agreed to buy in order to obtain the parking spaces for its failed Radio Lofts project."  (Id. ¶ 76.)

On February 12, 2014, Plaintiffs filed the instant action (Doc. No. 1), and on April 9, 2014, Plaintiffs filed their Amended Complaint (Doc. No. 13).  In their Amended Complaint, Plaintiffs allege that Defendant: (1) breached the Contract with Plaintiffs by (a) submitting its appraisal beyond the deadline set forth in the Contract, (b) refusing to allow its appraiser to adjust his appraisal based on additional data supplied by Plaintiffs, (c) acting in bad faith by using Plaintiffs' request as a baseless pretense in its attempt to declare Plaintiffs in default for the purpose of terminating the contract, and (d) to the extent Plaintiffs did default on the Contract, refusing to give Plaintiffs the opportunity to cure the default, (Compl. Count I); (2) breached the

implied covenant of good faith and fair dealing by attempting to deprive Plaintiffs of the benefits

of the Contract and by otherwise acting in bad faith, (Compl. Count II); (3) was unjustly enriched

because, as a result of entering into the Contract, Defendant was able to purchase surface parking

lots, which it would not have been able to purchase had it not entered into the Contract, and by

breaching the Contract Defendant was able to purchase those surface parking lots without

purchasing the Property, (Compl. Count III), and; (4) is liable under a theory of promissory

estoppel because Defendant made a clear and definite promise to purchase the Property, made

that promise with the expectation that Plaintiffs would rely on it, and Plaintiffs did reasonably

rely on that promise to their detriment because they made no additional efforts to sell the

Property.  (Compl. Count IV.)

Defendant filed the present motion to dismiss the Amended Complaint pursuant to Rule

12(b)(6) on April 22, 2014.  On May 19, 2014, Plaintiffs filed their opposition to Defendant's

motion to dismiss, as well as a cross-motion for leave to file their second amended complaint, to

seek specific performance of the Contract pursuant to their claim for breach of contract. (Doc

No. 19).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to

state a claim upon which relief can be granted.  When evaluating a motion to dismiss, "courts

accept all factual allegations as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)

(quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a

complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to

"state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009);

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis.  Santiago v.

Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the

elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second,

the court should identify allegations that, "because they are no more than conclusions, are not

entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where

there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556

U.S. at 680).  This plausibility determination is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

A complaint cannot survive where a court can only infer that a claim is merely possible rather

than plausible.  Id.

Under the Federal Rules of Civil Procedure, leave to amend pleadings shall be "freely

give[n]" when "justice so requires."  Fed. R. Civ. P. 15(a)(2).  In Foman v. Davis, 371 U.S. 178

(1962), the Supreme Court articulated the liberal policy of allowing amendments underlying

Rule 15(a) as follows:

> If the underlying facts or circumstances relied upon by a plaintiff
> may be a proper subject of relief, he ought to be afforded an
> opportunity to test his claim on the merits.  In the absence of any
> apparent or declared reason—such as undue delay, bad faith or
> dilatory motive on the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue prejudice
> to the opposing party by virtue of allowance of the amendment,
> futility of amendment, etc.—the leave sought should, as the rules
> require, be "freely given."

Id. at 182; see also Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).

In determining if a proposed amendment should be denied based on futility grounds, courts employ the "same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010) (citations omitted); see also Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) ("An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."). As described above, under Rule 12(b)(6), a motion to dismiss may be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. While "detailed factual allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Id. at 555; see also Iqbal, 556 U.S. at 678-79.

## III.   DISCUSSION[5]

---

[5] The Court notes that in diversity cases it is required to apply the substantive law as decided by the highest court of the state whose law governs the action. See United Mines Workers of American v. Gibbs, 383 U.S. 715, 726 (1966) (citing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)). This means applying New Jersey choice-of-law rules to determine which state law should govern the present action. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941); Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 171 (3d Cir. 2011).

For contract claims, "[u]nder New Jersey law, if the parties to a contract agree that a particular state's law will govern their rights and duties under the contract, the courts will generally honor the agreement, unless: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state, which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of Restatement of Conflict § 187, would be the state of the applicable law in the absence of an effective choice of law by the parties." Christy v. We the People Forms and Serv. Ctr.s, USA, Inc., 213 F.R.D. 235, 239 (D.N.J. 2003) (citing Restatement (Second) of Conflict of Laws § 187; Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd., 847 F. Supp. 1244, 1248 (D.N.J. 1994)).

Here, the Contract specifically provides that "[t]o the extent permissible, [the Contract] shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey." (Contract ¶ 20(c).) New Jersey has a substantial relationship with the parties, as the Property subject to the Contract is located in the state of New Jersey, both parties are apparently doing business in New Jersey, and Plaintiffs are a citizens of New Jersey. The Court deduces no reason why the application of New Jersey law would be contrary to a fundamental policy of a state, which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of Restatement of Conflict § 187, would be the state of the applicable law in the absence of an

**A.**     **Count I**

As noted above, Count I of Plaintiffs' Amended Complaint alleges Defendant breached the Contract with Plaintiffs for the sale of the Property.  In turn, Defendant has moved to dismiss Plaintiffs' claim for breach of contract for failure to state a claim.

To maintain a claim for breach of contract under New Jersey law, Plaintiffs must allege: (1) the existence of a contract; (2) that Defendant breached the contract; (3) damages flowing Defendant's breach, and; (4) that Plaintiffs performed their own contractual duties.  See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002). Both parties agree upon existence of the Contract, and Defendants do not dispute that Plaintiffs suffered damaged as a result of Defendant's alleged breach.

Defendant's principle argument is that Plaintiffs have failed to allege that Defendant in fact breached the Contract.  It claims Plaintiffs' allegations that Defendant submitted its appraisal beyond the deadline set forth in the Contract, refused to allow its appraiser to adjust his appraisal based on additional data supplied by Plaintiffs, acted in bad faith by using Plaintiffs' request as a baseless pretense in its attempt to declare Plaintiffs in default for the purpose of terminating the contract, and, to the extent Plaintiffs did default on the Contract, refused to give Plaintiffs the opportunity to cure the default, are all deficient as a matter of law.

Defendant first contends that Plaintiffs' allegation that Defendant breached the Contract by submitting its appraisal beyond the deadline set forth in the Contract is barred by the applicable statute of limitations, and Plaintiffs do not dispute this.  (Def.'s Br. at 7; Pls.' Opp'n at 4; see N.J. Stat. Ann. § 2A:14-1 (statute of limitations for breach of contract claim in New Jersey is six years).)  However, Plaintiffs supposedly do not rely on this conduct to show that

---

effective choice of law by the parties.  Accordingly, the Court will apply New Jersey law to its examination of the terms of the Contract.

Defendants' breached the Contract, but rather as further evidence that Defendant's "failed to proceed in good faith generally, thereby materially breaching the [Contract]." (Pls.' Br. at 5.) Whether this conduct is alleged to be a breach in and of itself, or illustrative of a more general breach of the Contract, it occurred more than six years prior to the filing of this suit, and is barred by the statute of limitations as a basis for Plaintiffs' breach of contract claim.

Next, Defendant argues that, according to the actual terms of the Contract, it could not have breached the Contract by refusing to submit a revised appraisal. (Def.'s Br. at 7.) It claims nowhere in the Contract did either party have "any right to demand 'revised' appraisals under any circumstances," and that, "as a matter of law, [Defendant] was not required—or even permitted—to submit a 'revised' appraisal." (Id. (citing Contract ¶ 2(c)).) Plaintiffs contend that the Contract did not expressly preclude revised appraisals, and Defendant's strict interpretation of the Contract is "absurd." (Pls.' Opp'n at 6.) In support they point to paragraph 2(c)(ii) of the Contract, which required the parties to "cooperate fully, promptly and in good faith in connection with such appraisals." (Id. (citing Compl. ¶ 39; Contract ¶ 2(c)(ii)).) The language in that sub-section, however, relates back to paragraph 2(c)(i), which describes the method for selecting the original two appraisers and having the property appraised in the first place. (See Contract ¶ 2(c)(i) ("within ten … days after the date hereof, [the parties] shall each request an appraisal of the Property … to be provided by [a certified appraiser] … which request shall provide that the respective appraisals be furnished within thirty … days").) Plaintiffs' reliance on the language in paragraph 2(d) is similarly misplaced, as it clearly relates to "the failure or refusal of a party to proceed as provided [in paragraph 2(c)] in a timely fashion and in good faith." (Contract ¶ 2(d); see Pls.' Opp'n at 5.) Plaintiffs have not alleged that Defendant selected its original appraiser in bad faith, that it refused to cooperate fully with Plaintiffs or the three appraisers in obtaining

their appraisals, or generally that it proceeded in bad faith up and until the various steps in paragraph 2(c) of the Contract were initially complied with.  Rather, Plaintiffs argue that Defendant proceeded in bad faith under this sub-section when it failed to allow a revised appraisal.  (Id. at 6.)  They contend that "the right to demand (or request) revised appraisals is not explicitly precluded by the Contract," and the requirement to cooperate in good faith is so required.  (Id.)  Yet, this is not enough to assert that Defendant breached the terms of Contract for its refusal to allow a revised appraisal.  Plaintiffs acknowledge the Contract does not require that the parties entertain revised appraisals, the reading of paragraph 2(c)(ii) clearly relates only to the initial selection of the appraisals and the submission of their appraisals, and paragraph 2(d) relates more generally to the steps laid out in paragraph 2(c).  Plaintiffs have not alleged that a term is missing from the contract, or that the language of the Contract should be read differently than its otherwise apparent meaning.  "Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written." Kutzin, 124 N.J. at 507 (quoting Levison v. Weintraub, 215 N.J. Super. 273, 276 (App. Div. 1987)).  As such, Plaintiffs' breach of contract claim cannot rest on the purported breach of the "good faith" provisions in the Contract.

The remaining basis for Plaintiffs' claim for breach of contract, which they contend their allegations in the Amended Complaint "make abundantly clear," is that their damages flow from "[Defendant's] abrupt termination of the [Contract], when [the flaws in the appraisal process] were brought to its attention, and its subsequent refusal to permit Plaintiffs to cure any alleged material breach."  (Pls.' Opp'n at 7.)

Defendant claims the allegation that it improperly terminated the Contract fails as a matter of law, because the Contract expressly provided a right for Defendant to terminate the

Contract when Plaintiffs failed to follow the agreed-upon procedures for establishing the Property's purchase price.  (Def.'s Br. at 8 (citing Contract ¶ 2(d)).)  Further, Defendant asserts there is "no dispute that plaintiffs materially breached the Contract" by refusing "to accept the agreed-upon purchase price and instead [demanding] … that all appraisers submit 'revised' appraisals."  (Def.'s Br. at 8-9.)  According to Defendant, under the terms of the Contract and New Jersey law, as soon as Plaintiffs materially breached the Contract, Defendant was entitled to terminate the Contract.  (Id. at 8 (citing Contract ¶ 17(b); Noland v. Lee Ho, 120 N.J. 465, 472 (1990); Medivox Productions, Inc. v. Hoffman-LaRoche, Inc., 107 N.J. Super. 47, 68 (Law Div. 1969); In re Nickels Midway Pier, LLC, 372 B.R. 218, 223 (D.N.J. 2007)).)

The Court is not persuaded that, as a matter of law, Defendant had the right to terminate the Contract immediately upon Plaintiffs' alleged material breach.  According to the terms of the Contract, "[a material breach of the Contract for failure to proceed with the terms in ¶ 2(c) shall entitle the other party to all rights and remedies for such material breach and default as provided in this Agreement."  (Contract ¶ 2(d).)  Reading on further in paragraph 17 of the Contract, it states that if Plaintiffs "fail or refuse to cure any default or breach by [Plaintiffs] of [the Contract], [Defendant] shall be entitled to exercise all of its rights under [the Contract] … and, without limiting the foregoing, shall have the option of: (i) terminating [the Contract]"  (Id. ¶ 17(b) (emphasis added).)  On the face of it, that paragraph states that Defendant is entitled to terminate the agreement if, and only if, Plaintiffs failed or refused to cure a default or breach.[6]

Nor does the case law cited by Defendant lend support to its position.  In Medivox the Superior Court, discussing an alleged breach of an installment contract, noted that the plaintiff's

---

[6] Despite Defendant's confidence that this is not what the Contract says, the meaning and interplay of the language in paragraphs 2(d) and 17(b) in the Contract is, at the least, a disputed issue, and any ambiguity cannot be resolved in favor of Defendant a motion to dismiss.

decision to terminate the contract came after it had repeatedly expressed dissatisfaction with the defendant by letter, memoranda, phone and at several personal meetings, and the defendant had been given over five months to perform in accordance with the contract.  107 N.J. Super. at 68. Finding that the plaintiff's repeated expression of dissatisfaction with Defendant's performance was "in good faith," the court found that the defendant had committed a material breach and the plaintiff was entitled to terminate the contract.  Id.  Nolan merely states that a material breach of a contract relieves the non-breaching party of its obligations under the contract, but says nothing of the right to exercise that option despite a contract clause to the contrary.  See 120 N.J. 472. Similarly, In re Nickels states that a "material breach on the part of one party entitles the other party to terminate it."  372 B.R. at 223 (citing Young Travelers Day Camps, Inc. v. Felsen, 118 N.J. Super. 304, 310 (Dist. Ct. 1972)).  Defendant has not attempted to reconcile its position, unaddressed by the case law it cited, with the fact that the Contract apparently has a term limiting the non-breaching party's option exercise its right to terminate the Contract to instances where the breaching party fails or refuses "to cure any default or breach."  (Contract ¶ 17(b) (emphasis added).)[7]

    Additionally, Defendant overstates the indubitable nature of Plaintiffs' supposed material breach of paragraph 2(c) of the Contract.  The allegations show that both parties obtained their

---

[7] In its briefs, Defendant further contends that allowing Plaintiffs to cure their material breach would have "[made] no sense."  (Def.'s Rep. at 5; Def.'s Br. at 9.)  They reason that, because Plaintiffs were unwilling to initially accept the $1,100,000 purchase price, and instead demanded revised appraisals, requesting that Plaintiffs accept the $1,100,000 in lieu of be considered in breach of the Contract would be nonsensical.  (Id.; Def.'s Rep. at 5.)  The Court finds such an argument highly disingenuous.  Without regard to what Plaintiffs did in fact allege in their Amended Complaint and argue in their opposition brief, on what basis should the Court conclude that Plaintiffs were absolutely unwilling to attempt to cure their alleged breach if Defendant so alerted them?  The Court cannot assume that, when a party to a contract takes a particular position, if presented with the subsequent choice of either changing its position or being found in breach of contract, it will never opt to change its position.  In fact, Plaintiffs have alleged that, if given the opportunity, they would have "cured" their alleged default by accepting the $1,100,000 purchase price.  (Compl. ¶¶ 73-74.)  They also alleged that Defendant alerted them of the supposed breach and then ceased all communication after Plaintiffs had requested revised appraisals, but without any forewarning or opportunity to cure a breach.  (See id. ¶ 75; Pls.' Opp'n at 10 n.1.)  At the very least this issue is subject to a factual dispute between both parties, and is not properly dismissed under Rule 12(b)(6).

original appraisals in accordance with paragraph 2(c)(i)-(iii), and then proceeded to obtain a

third-party appraisal according to the terms of paragraph 2(c)(iv).  All that was left, according to

the terms of the Contract, was that the purchase price for the Property be determined according

to the terms of paragraph 2(c)(iv), and then purchase price be "confirmed by written notice from

[Defendant] to [Plaintiffs] and Escrow agent within five (5) days of the receipt of [the]

appraisals."  (See Contract ¶ 2(c)(iv) (stating that the purchase price was to be confirmed in

accordance with ¶ 2(c)(iii)).)  Plaintiffs' Amended Complaint suggests that these procedures

were followed.  (See Compl. ¶¶ 49-54.)[8]  Based on the allegations in the Complaint and the

express terms of the Contract, it is not "beyond dispute" that Plaintiffs materially breached the

contract by requesting revised appraisals after the initial terms of the Contract were honored.

Paragraph 2(d) of the Contract states that "failure or refusal of a party to proceed as provided [in

¶ 2(c) of the Contract] in a timely fashion and in good faith" constituted a material breach.  In

their Amended Complaint Plaintiffs alleged that they did proceed according to paragraph 2(c) in

a timely fashion.  Beyond this, the Contract is silent concerning whether or not Plaintiffs

breached the Contract by requesting revised appraisals subsequent to complying with paragraph

2(c).

 The Court cannot conclude that, based on the pleadings and the exhibits attached thereto,

Plaintiffs failed to perform according to the terms of the Contract material to this dispute, or in

the alternative, that Defendant had an absolute and immediate right to terminate in the event of

---

[8] While Plaintiffs note that the $1,100,000 purchase price "was never confirmed" because its realtor discovered material information that should have affected the appraisals, (Compl. ¶ 52.), the language of the Contract states that the purchase price was to be confirmed by "written notice from the Purchaser to Seller and Escrow Agent." (Contract ¶ 2(c)(iii).)  Even if the purchase price was not confirmed according to the terms of the Contract, it was apparently Defendant's obligation to confirm the price.  Nor has Defendant alleged that Plaintiffs breached this particular term in the Contract.

Plaintiffs' alleged breach.  Accordingly, the Court will deny Defendant's motion to dismiss Count I of the Amended Complaint.

### B.        Damages Limitation for Count I

In the event that this Court declines to dismiss Count I of the Amended Complaint, as it has, Defendant moves to limit the monetary damages available under Count I to the deposit amount in the Contract.  (Def.'s Br. at 10-11; Def.'s Rep. at 7-8.; see also Contract ¶ 17(a) "If [Plaintiffs] shall not be in default hereunder, and [Defendant] shall … fail or refuse to correct any default or breach by [Defendant] of this Agreement, then and in any such case, the Deposit shall be paid to [Plaintiffs] by [Defendant] as agreed upon liquidated damages for such breach, as [Plaintiffs'] sole remedy").)

The law of the Third Circuit is that, in certain circumstances, affirmative defense may be raised by a motion under Rule 12(b)(6).  See ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) ("[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense like the statute of frauds appears on its face."); Continental Collieries, Inc. v. Shober, 130 F.2d 631, 635 (3d Cir. 1942) ("[W]here the defect appears on the face of the pleading, the question may be raised on motion to dismiss for insufficiency."); see also Simon v. U.S., 891 F.2d 1154, 1156 (5th Cir. 1990) (holding that a statutory damages limitation is an affirmative defense "because it is an 'avoidance' within the meaning of Rule 8(c)," meaning it is an "allegation or statement of new matter, in opposition to a former pleading, which, admitting the facts alleged in such former pleading, shows cause why they should not have their ordinary legal effect.") (internal quotations omitted) (quoting Ingraham v. U.S., 808 F.2d 1075, 1079 (5th Cir. 1987)).  As noted above, Rule 12(b)(6) empowers this Court to examine documents, such as the Contract attached to the Original Complaint and upon which Plaintiffs rely in their Amended

Complaint, which are "undisputedly authentic."  Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Generally "[w]hen the terms of [a contract] are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties."  Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960).  However, this Court's determination concerning whether the stipulated damages provision will apply requires the consideration and weighing of evidence outside the record, which is improper on a motion to dismiss under Rule 12(b)(6).  New Jersey courts view the enforceability of stipulated damages clauses "as depending on whether the set amount is a reasonable forecast of just compensation for the harm that is caused by the breach and whether that harm is incapable or very difficult of accurate estimate."  Wasserman's Inc. v. Township of Middletown, 137 N.J. 238, 250 (1994); see also MetLife Capital Fin. Corp. v. Washington Ave. Associates L.P., 159 N.J. 484, 495 (1999) (finding that "reasonableness [is] the standard for deciding the validity of stipulated damages clauses," and that that the "difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the validity of a stipulated damages clause all affect the validity of a stipulated damages clause.") (citing Wasserman's, 137 N.J. at 249, 250-54).  It is true that liquidated, or stipulated damages clauses are "deemed presumptively reasonable" in New Jersey, and the party challenging a stipulated damages clause "[bears] the burden of proving its unreasonableness."  Id., 137 N.J. at 252; see also Central Steel Drum Co. v. Gold Cooperage, Inc., 200 N.J. Super. 251, 265 (1985), certify. denied, 101 N.J. 303 (1985), overruled on other grounds, Kutzin, 124 N.J. 500 ("[I]n the context of commercial parties having comparable bargaining power there should be presumptive validity of a liquidated damage clause.")  Yet, where the Court has only the pleadings and the terms of the Contract, which do not specify the

actual damages sustained, elucidate the difficulty in assessing damages at the time of the

Contract's formation, or say anything of the parties' intentions, it cannot grant Defendant's

motion under the standard of Rule 12(b)(6).[9]  Defendant's own argument in support of this claim

confirms this problem, as the Court has no allegations properly before it showing how the

Contract was negotiated or why the damages limitation does or does not violated public policy.

(See Def.'s Br. at 11).  Defendant is free to raise the damages limitation as an affirmative defense

in its answer, but the Court will deny Defendant's current motion to limit damages under the

breach of contract claim to the damages limitation in the Contract.

### C.      Count II

In Count II Plaintiffs allege that Defendant breached the implied covenant of good faith

and fair dealing.  Defendant argues that Plaintiffs fail to state a claim for a breach of the duty of

good faith and fair dealing because it is merely duplicative of Plaintiffs' breach of contract claim.

(Def.'s Br. at 11-12; Def.'s Rep. at 8-9.)

In New Jersey, every contract contains an implied covenant of good faith and fair

dealing.  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc., 182 N.J. 210,

224 (2005); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997).  In New Jersey, "a

---

[9] The Court notes that Plaintiffs do contest the meaning of the language in paragraph 17(a), (Pls.' Opp'n at 12), as well as the correct amount of the deposit under the terms of the Contract.  (Id. at 13-14.)  While neither of these issues requires the Court to look beyond the pleadings or the documents attached thereto, they do not address the reasonableness of the stipulated damages provision.  Plaintiffs are clearly correct in their assertion that it would be improper at this stage in the litigation to set the damages amount to the exact amount put forth by Defendant, because that amount rests on proper amount of the final purchase price, which is an important and contested fact in this case.  However, Plaintiffs' other argument with respect to the meaning of the language in paragraph 17(a) is clearly erroneous.  The language of the Contract is unambiguous that, in the event of a default or breach by Defendant, Plaintiffs' sole remedies available under the Contract were to keep the deposit or seek specific performance, but the right to "retain the Deposit" was not solely applicable where Defendant had already provided the Deposit to Plaintiffs.  (See Contract ¶ 17(a) "[In the event of Defendant's default] the Deposit shall be paid to [Plaintiffs] by [Defendant] as agreed liquidated damages for such breach, as [Plaintiffs'] sole remedy, [or, in the alternative], [Plaintiffs] … may seek specific performance of the agreement. … If [Plaintiffs elect] to retain the Deposit as liquidated damages, [the Contract] shall be deemed terminated and neither [party] shall have any further rights or obligations [thereunder]." (emphasis added).)

party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001) (quoting Sons of Thunder, 148 N.J. at 422); see also Atlantic City Racing Ass'n v. Sonic Financial Corp., 90 F. Supp. 2d 491, 511-12 (D.N.J. 2000) ("Sons of Thunder and Colgate both stand for the proposition that a party must continue in good faith to perform its obligations under an existing contract until the final hour when termination of the contract, even pursuant to an express and absolute right to terminate, takes effect."); id. at 511 (noting that, though a party's motive for terminating a contract is irrelevant where it does so pursuant to express and unambiguous terms in the contract, "a jury reasonably could find that [a party] breached its duty of good faith, not by terminating the agreement, but based on its conduct preceding cancellation of the agreement") (citing Sons of Thunder, 148 N.J. at 424-25). This is because "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 420. Yet, "[w]ithout bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Wilson, 168 N.J. at 251.

Generally, the implied covenant has been applied in three ways: (1) the covenant permits the inclusion of terms and conditions not expressly set forth in the written contract, (2) the covenant has been used to allow redress for bad faith performance of an agreement even where the defendant has not breached any express term, and (3) the covenant permits inquiry into a party's exercise of discretion expressly granted by the contract's terms. Seidenberg v. Summit Bank, 348 N.J. Super. 243, 257 (App. Div. 2002). However a "[p]laintiff may not maintain a separate action for breach of the implied covenant of good faith and fair dealing [where] it would

be duplicative of [its] breach of contract claim." Hahn v. OnBoard LLC, No. 09-3639, 2009 WL 4508580, at *6 (D.N.J. Nov. 16, 2009).

While Defendant claims Plaintiffs allegations in Count II are identical to those in Count I, the Court disagrees.  The Court finds that Plaintiffs have alleged facts, distinct from their remaining breach of contract claim, that Defendant breached the implied covenant of good faith and fair dealing.  Plaintiffs assert in their Amended Complaint, Defendant "acted in bad faith by using the flimsiest of pretenses to avoid purchasing a building that it only reluctantly agreed to buy in order to obtain the parking spaces [near the Property]."  (Compl. ¶ 76; see also id. ¶¶ 67-70 (describing Defendant's motive for bad faith, and claiming that Defendant "decided to use any pretense, no matter how slim, to terminate the agreement.")  It is evident from Plaintiffs' Amended Complaint that they have claimed Defendant never wished to purchase the Property, and sought the slightest pretext to terminate the Contract.  This allegation does not necessarily rest on a claimed breach of the Contract by Defendant, but on Defendant's alleged bad faith in dealing with Plaintiffs' request for amended appraisals, and bringing about the hasty termination of the Contract without giving Plaintiffs a chance to cure a supposed default, even if such a termination was technically within its rights under the Contract.[10]  According to Plaintiffs' averments, Defendant would retain the parking spots it originally sought and would save a considerable amount of money if it were not required to purchase the Property, and the

---

[10] While Count I of the Amended Complaint contains allegations of "bad faith" in the claim for breach of contract, the Court notes that these allegations do not properly support Plaintiffs' claim for breach of contract, as discussed supra.  However, the Court does not consider any allegations that Defendant breached specific the terms of the contract through bad faith as part of its analysis concerning the implied covenant.  (See Compl. ¶¶ 39, 42 (citing Contract ¶ 2(c)(ii); id. ¶ 2(d)).)  Instead, it rests its holding on the "bad faith" allegations which do not form the factual basis for Plaintiffs' breach of contract claim.  These allegations may be properly considered for the purposes of Plaintiffs' breach of the implied covenant of good faith and fair dealing claim in Count II without running afoul of the distinction between express and implied contractual conditions.  See Wade v. Kessler Inst., 172 N.J. 327, 340-41 (citing Bak-a-Lum Corp. of America v. Alcoa Bldg. Products, Inc., 69 N.J. 123, 130 (1976); Williston on Contracts § 36:12 at 423-24 (4th ed. 2000)).

allegations suggest it was never actually Defendant's intent to purchase the Property prior to the settlement agreement.  (See Compl. ¶ 2-3, 67-69.)  Whether within its rights or not, Defendant chose not to cooperate or indulge Plaintiffs when they requested revised appraisals, and notified Plaintiffs of immediate termination of the Contract, cutting off all communication thereafter. (See Compl. ¶¶ 4, 6, 62, 66, 70, 73-76.)  Drawing all inferences in favor of Plaintiffs, the Court finds that these allegations are sufficient to state a distinct claim for breach of the implied covenant of good faith and fair dealing.  Therefore, the Court will deny Defendant's motion to dismiss Count II of the Amended Complaint.

### D.      Counts III and IV

In Counts III and IV Plaintiffs also allege claims for unjust enrichment and promissory estoppel.  Defendant contends, correctly, that because there is no dispute that a valid contract governs the subject of Plaintiffs' quasi-contractual claims, these claims should be dismissed. (Def.'s Br. at 12-13.)

As noted above, both parties agree that a valid contract was in place, and Plaintiffs allege a breach of that contract as the sole basis for both of their quasi-contractual claims.  (See Compl. ¶ 98 ("By breaching the Contract, [Defendant] was able to purchase or otherwise use the surface parking lots without purchasing the Property as a precondition of that purchase and/or use.") (emphasis added); id. ¶ 92 ("[Defendant] made a clear and definite promise to purchase the Property, and made that promise with the expectation that [Plaintiffs] would rely on it.") (emphasis added).)  As such, their claims for equitable restitution are barred.  Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109-110 (App. Div. 1966) (stating that "recovery on the theory of quasi-contract was developed under the law to provide a remedy where none existed" and thus holding that because plaintiffs had an express contract, they had a

remedy and therefore they could not pursue their quasi-contract claim); St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n, No. 04-4540, 2005 WL 1199045, at *7 (D.N.J. May 18, 2005) ("Where there is an express contract covering the identical subject matter of the claim, plaintiff cannot pursue a quasi-contractual claim for unjust enrichment.") (citing Winslow v. Corp. Express, Inc., 364 N.J. Super. 128, 143 (App. Div. 2003)); Sullivan v. Sovereign Bancorp., Inc., No. 99–5990, 2001 WL 34883989, at *9 (D.N.J. Jan. 19, 2001) (dismissing promissory estoppel claims pursuant to Rule 12 because "claims based on quasi-contract cannot survive where the Court finds that a valid contractual agreement exists to govern the parties' relations.") Based on the foregoing, Counts III and IV will be dismissed with prejudice, as Plaintiffs cannot amend their Amended Complaint to state a violation of quasi-contract based on an actual breach of the Contract.

### E.      Motion for Leave to Amend

Plaintiffs also seek leave to amend their Amended Claim, pursuant to Rule 15(a)(2), in order to seek the remedy of specific performance under their breach of contract claim.  (Pls.' Opp'n at 19-21.)  Defendant asks the Court to deny Plaintiffs' motion for leave to amend, arguing that specific performance is not appropriate where (1) Plaintiffs' claim for breach of contract fails as a matter of law, or in the alternative, (2) Plaintiffs' waited six years to file an action seeking specific performance.  (Def.'s Rep. at 10-12.)  Defendant does not contend that Plaintiffs' motion for leave to amend was filed with undue delay, was made in bad faith or for a dilatory motive, or is unduly prejudicial.  See Forman 371 U.S. at 182.  Defendant's opposition is apparently based only on the alleged futility of Plaintiffs' amended claim.  See Lutsky v. Monmouth Marine Engines, Inc., No. 12–7554, 2014 WL 575459, at *2 (D.N.J. Feb. 11, 2014) ("An amendment to a complaint is considered futile if it would not survive a motion to dismiss

under Rule 12(b)(6).")  At the outset, the Court notes that Defendant's first argument against Plaintiffs' motion for leave to amend is unpersuasive, as the Court will not grant Defendant's motion to dismiss Plaintiffs' breach of contract claim.  All that remains is Defendant's contention that amending the Amended Complaint to seek specific performance would be futile.

The Court finds that, notwithstanding Defendant's arguments concerning the amount of time which has elapsed since the alleged breach and the current action, Plaintiffs' allegations raise a right to relief capable of surviving a motion to dismiss.  See id.  ("A motion to dismiss may be granted, or in this case a proposed amendment deemed futile, 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'") (quoting Brown v. Phillip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984))).  Here Plaintiffs allege that, in the event that Defendant materially breached the Contract, Plaintiffs possess the right to seek specific performance of the Contract.  (See Ex. A to Pls.' Opp'n, Proposed Second Amended Compl. ¶ 44.)  The language of the Contract supports the sufficiency of Plaintiffs' claim.  (See Contract ¶ 17(a) ("If [Plaintiffs] shall not be in default hereunder, and [Defendant] shall fail or refuse to proceed with this Closing hereunder and/or fail or refuse to correct any default or breach by [Defendant] of this Agreement, then and in any such case … [Plaintiffs] at [their] option, may seek specific performance of this Agreement.")  Defendant does not dispute that the Contract provides a possible right to specific performance for a non-breaching party, (see Def.'s Br. at 11 n.5), or that Plaintiffs have adequately alleged their right to this remedy.

Instead, Defendant asserts what appears to be the defense of laches to Plaintiffs' motion for leave to amend.  See Lavin v. Bd. Of Educ., 90 N.J. 145, 151 (1982) ("Laches in a general sense is the neglect, for an unreasonable and unexplained length of time, under circumstances

permitting diligence, to do what in law should have been done. More specifically, it is

inexcusable delay in asserting a right.") (quoting Atlantic City v. Civil Service Com'n of N.J., 3

N.J. Super. 57, 60 (App. Div. 1949)).  The Court finds that it would improper to grant a motion

to dismiss under Rule 12(b)(6) based on this affirmative defense, as it would require making

further factual findings and weighing the evidence presented by each party.  See Knorr v. Smeal,

178 N.J. 169, 181 (2003) ("The key factors to be considered in deciding whether to apply the

doctrine [of laches] are the length of the delay, the reasons for the delay, and the changing

conditions of either or both parties during the delay," because "[t]he core equitable concern in

applying laches is whether a party has been harmed by the delay.") (internal quotation marks and

citation omitted); see also Fagin v. Gilmartin, 432 F.3d 276, 284 n.1 (3d Cir. 2005) ("'[T]he

existence of a defense does not undercut the adequacy of the claim' on a Rule 12(b)(6) motion to

dismiss.") (quoting Deckard v. Gen. Motors Corp., 307 F.3d 556, 560 (7th Cir. 2002)).

Accordingly, the Court will grant Plaintiffs' motion for leave to file an amended

complaint to seek specific performance under their breach of contract claim.

**IV.**          **CONCLUSION**

For the reasons expressed above, Defendant's motion to dismiss will be **GRANTED IN PART** and **DENIED IN PART**.  Defendant's motion will be **DENIED** as to Counts I and II. Defendant's motion to limit damages for Plaintiffs' breach of contract claim in Count I will also be **DENIED**.  Defendant's motion will be **GRANTED** as to Counts III and IV of the Amended Complaint, and those Counts will be **DISMISSED WITH PREJUDICE**.  Additionally, Plaintiffs' cross-motion for leave to file an amended complaint will be **GRANTED**.  An appropriate Order shall issue today.

Dated: 10/29/2014                              s/ Robert B. Kugler
                                               ROBERT B. KUGLER
                                               United States District Judge