NOT FOR PUBLICATION                                    (Doc. Nos. 45, 46, 56. 64.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                               :
ADLER ENGINEERS, INC. et al,                   :
                          Plaintiffs,          :        Civil No. 14-0921 (RBK/AMD)
                                               :
              v.                               :
                                               :        **OPINION**
DRANOFF PROPERTIES, INC.                       :
                          Defendants.          :
_____       :

**KUGLER**, United States District Judge:

This matter comes before the Court on the Defendant Dranoff Properties, Inc.'s

("Defendant") motion for summary judgment (Doc. No. 45) and motion for sanctions (Doc. No.

46), and the motion for an extension to complete discovery (Doc. No. 56) and motion for partial

summary judgment of Plaintiffs Adler Engineers, Inc., Adler Geoscience, Inc., and Adler

Associates, Inc. ("Plaintiffs") (Doc. No. 64).  For the reasons contained herein, Defendant's

motion for summary judgment is granted-in-part and denied-in-part, Plaintiffs' motion for partial

summary judgment is granted-in-part and denied-in-part**,** Dranoff's motion for sanctions is

denied, and Adler's motion for an extension of time to complete discovery is denied as moot**.**

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This action concerns the alleged breach of an Agreement of Sale for the purchase of the

property located at 129 Market Street, Camden, NJ, 08102 ("the Property").  On or around

October 3, 2007, Plaintiffs and Defendant executed an Agreement of Sale and Purchase ("the

Agreement" or "the Contract"), the terms of which arranged Defendant's purchase of the

Property from Plaintiffs.  (Def.'s SMF ¶ 1; Pls.' SMF ¶1.)  The Agreement establishes, among

other things, the procedures to which the parties were to adhere in determining the purchase price

of the Property.  First, each party was required to retain its own real estate appraiser, who was to

hold a certification from the Members Appraisers Institute ("MAI"), and who would provide an

appraisal of the Property within thirty days.  (Contract; ¶ 2(c)(i).)  The Contract also required

that, during the appraisal process,

> (ii) each party shall (A) provide to the other prompt written notice of its request
> for an appraisal and the identity of the appraiser selected; (B) cooperate fully,
> promptly and in good faith in connection with such appraisals; (C) provide to the
> other party, a true, correct, and complete copy of such appraisal within five (5)
> days of the receipt thereof.

(Id. ¶ 2(c)(ii).)  Once both were submitted, if the two appraisals were within 10% of each other,

the sale price would be the average of the two appraisals.  (Id. ¶ 2(c)(iii).)  If the two appraisals

differed by more than 10%, however, then the original two appraisers were required to select a

third MAI-certified appraiser to provide a third appraisal of the Property within thirty days of the

request.  (Id. ¶ 2(c)(iv).)  When the third appraiser had submitted his or her appraisal, if all three

appraisals did not differ by more than 15%, then the purchase price would be the average of all

three appraisals.  (Id.)  If any one of the three appraisals differed from the other two by more

than 15%, then it would be discarded, and the average of the remaining two would be the

purchase price.  (Id. ¶ 2(c)(iv).)   If all three of the appraisals differed from each other by more

than 15%, then the purchase price was to be the average of the two appraisals closest in amount

to each other, and the third appraisal was to be discarded.  (Id.)  In all circumstances, the

purchase price was to be confirmed by written notice from the Defendant to Plaintiffs and an

escrow agent within five days of the submission of the appraisals.  (Id. ¶¶ 2(c)(iii)–(iv).)

2

In addition to the procedures described above, the purchase price portion of the Contract contained the following term:

> The parties acknowledge that the determination of the Purchase Price in accordance with the foregoing subparagraph (c) is of the essence of this Agreement, and accordingly, the failure or refusal of a party to proceed as provided above or in a timely fashion and in good faith, shall be deemed to be a material breach of this Agreement and a default by such party, and shall entitle the other party to all rights and remedies for such material breach and default as are provided in this agreement.

(Id. ¶ (d).)  In the event of a material breach and default by one party, the Contract provided that

> If [Plaintiffs] shall not be in default hereunder, and [Defendant] shall fail or refuse to proceed with this Closing hereunder and/or fail or refuse to correct any default or breach by [Defendant] of this Agreement, then in any such case, the Deposit shall be paid to [Plaintiffs] by [Defendant] as agreed upon liquidated damages for such breach, as [Plaintiffs'] sole remedy, or [Plaintiffs] at [their] option, may seek specific performance of this Agreement. . . .

> If [Defendant] shall not be in default hereunder, and [Plaintiffs] shall fail or refuse to proceed and [Plaintiffs] shall fail or refuse to proceed with the Closing hereunder and/or fail or refuse to cure any default or breach by [Plaintiffs] of this Agreement, [Defendant] shall be entitled to exercise all of its rights under this Agreement at law or in equity, and, without limiting the foregoing, shall have the option of:  (i) terminating this Agreement, in which event the Escrow Agent shall return the Deposit to [Defendant], this Agreement shall become null and void, and neither party shall have any further obligations hereunder; or (ii) demanding specific performance under this Agreement.

(Contract ¶ 17(a)–(b).)

Pursuant to the terms of the agreement, Plaintiffs and Defendant each retained an MAI-certified appraiser to determine the fair market value of the Property.  On October 17, 2007, Plaintiffs' appraiser, Eugene Pasymowski ("Pasymowski"), valued the Property at $1,820,000.  (Pls.' SMF ¶ 5.)  On November 9, 2007, Defendant's appraiser, John Lynch ("Lynch"), valued the Property at $925,000.  (Id. ¶ 6.)  Because the two appraisals were more than 10% apart from one another, Plaintiffs' and Defendant's appraisers agreed to appoint a third-party appraiser, pursuant to the Contract.  (Id. ¶ 7.)  Approximately one month later, the parties had not selected

an appraiser, and Julian Toneatto ("Toneatto") of Adler Associates sent Pasymowski the following email: "Gene: I think you should move unilaterally on this…Please find some guy would agrees with you….I am sure you can discuss your findings..or how can you make sure he does it right?...what do you think?" (Def.'s Ex. D.) Toneatto contends this email was motivated by his frustration with Defendant's slow selection of a third appraiser. (See Toneatto Decl. ¶ 3–4.)

Sometime between December 12, 2007 and December 17, 2007, Plaintiffs rejected the selection of Tim Sheehan, whom Pasymowski and Lynch had selected as the third-party appraiser. (See Def.'s Ex. C.) Apparently Plaintiffs objected to the selection of Tim Sheehan based on his membership with the Urban Land Institute (ULI), of which Carl Dranoff, Defendant's principal, was also a member. (Id.) Defendant contacted Plaintiffs via email offering three additional suggestions for appraisers, noting that it did not understand why Mr. Sheehan's membership with the ULI was cause for an objection as the ULI has thousands of members. (Id.) The parties eventually agreed to the selection of Lee Romm as the third-party appraiser. Mr. Romm appraised the Property at $1,275,000. (Defs.' SMF ¶ 10.)

Because all three appraisals differed by more than 15%, the Contract terms required that the purchase price be determined by averaging Defendant's appraisal and the third-party appraisal because, of the three, they were the closest in amount to one another. (See Contract ¶ 2(c)(iv).) This resulted in a purchase price of $1,100,000, which Defendant confirmed via email to Plaintiffs on Thursday, February 14, 2008. (See Def.'s Ex. E.) Sometime that day or the following day, Plaintiffs' attorney, Kenneth Roth ("Roth") confirmed the purchase price as well. (See Defs.' Ex. F.) However, Toneatto contends that his attorney did so without his permission or knowledge. (See Tonatto Decl. ¶ 11.)

4

Plaintiffs appear to have communicated on multiple occasions with their own appraiser, Pasymowski, about revising his appraisal.  On February 10, 2008, Toneatto wrote to Pasymowski, "If your appraisal were $200,000 less I would probably be okay . . . ."  (See Def.'s Ex. H.)  Four days later, Toneatto again emailed Pasymowski, this time requesting that he revise his appraisal to account for some apparent miscalculations.  (See Def.'s Ex. I.)  Pasymowski agreed, but advised Toneatto to discuss with his lawyer whether a revised appraisal could even be considered under the terms of the contract.  (Def.'s Ex. J.)  Toneatto responded as as follows,

> I would appreciate if you would look at your work and IF it would reduce your appraisal to $1,600,000 then yours would be in play and not Lynch's.  Another challenge may be that Romm had copies of both reports! Does that make his NOT independent? . . . . . I think we should try it especially since you have a cogent reason for the revision . . . . . Please also understand and I know your time is valuable and I would be glad to pay you for that time. . . .

(Def.'s Ex. K. (ellipses in original).)

On February 15, Roth indicated via email to Defendant's attorney that it had "communicated agreement with the purchase price too quickly."  (Id.)  Specifically, Plaintiffs' attorney communicated that they believed Romm, the third-party appraiser, had failed to take into consideration multiple pieces of information, including, an offer to purchase the property for $1.5 million, a comparable sale for $160 per square feet, and a lease then on the property.  (Id.) He conveyed these issues to Romm by way of letter dated February 19, 2008:

> Based upon the above factors, it is my belief that your appraisal report does not properly take into consideration these facts, not opinions, that would lead to a higher value for the property.  This higher value would have a significant impact on the sale price of the property and I urge you to take the above into consideration and amend your appraisal report with the information provided or explain the reasons that these existing facts were not taken into consideration.

(Defs.' Ex. G.)

On February 20, 2008, Defendant's attorney emailed Roth to terminate the Contract, on grounds that Plaintiffs' "demand that the Romm Appraisal be revised is a blatant and material breach of the Agreement of Sale." (Pls.' Ex. I.) He added that "[s]uch action constitutes a willful, bad faith attempt to interfere with contractual arrangements which were very carefully negotiated and documented respecting the determination of the purchase price."

Roth responded later that day, confirming Plaintiffs' belief that both the Lynch and Romm appraisals "failed to adhere to the standards and guidelines of the relevant accrediting organizations by failing to take into consideration existing facts on the record as to the value of the Property and to use those facts or reject them as the appraisers see fit using their professional judgment." (Def.'s Ex. M.) Roth further provided that "if [Romm] can explain why those facts should not be considered or are irrelevant then [Plaintiffs] will move on from there. If your client wishes to declare a default and terminate the agreement then that is their prerogative and we will deal with the consequences down the line." (Def.'s Ex. M.)

On March 4, 2008, Romm supplemented his appraisal, advising the parties that the additional facts Plaintiffs raised did not impact his valuation but correcting his appraisal to $1,285,000 because of a mathematical error he discovered. (Def.'s Ex. N.) Nevertheless, the parties continued to dispute the appraisals. Plaintiffs affirmed their position that the appraisals were inaccurate, and Defendant continued to assert that Plaintiffs "refusal to accept these arrangements continue[d] to constitute a material, intentional and willful default under the Agreement." (Def.'s Ex. O.)

At some point, Pasymowski revised his report and reduced his appraisal from $1.82 million to $1.5 million, which Plaintiffs forwarded to Defendant on April 10, 2008, again affirming their position and offering to sell the Property for $1,392,500—the

purchase price when averaging Romm's and Pasymowski's revised appraisals. (Def.'s Ex. P.)  Defendants were not receptive, and again asserted that Plaintiffs' actions appeared "to be a second deliberate attempt to manipulate the appraisal process under the Agreement of Sale."  (Id.)

Plaintiffs filed the instant action approximately six years later on February 12, 2014.  In his declaration in support of summary judgment, Toneatto contends that he never gave Roth permission to confirm the purchase price and that Roth did so without knowing that Toneatto had requested the appraisers revise their appraisals.  He also asserts that he never received Defendant's April 14, 2008 email in which Defendant claimed that Plaintiffs were in continuing default, but that had he received it, he "certainly would have instructed [Roth] to accept Dranoff's offer to purchase the Property for $1.1 million."  (See Toneatto Decl., Doc. No. 56.) Indeed, Plaintiffs now seek to assert claims against Roth for professional negligence, breach of contract, and fraud, for his failure to provide Plaintiffs with the April 14, 2008 email.  (See Pls.' Mot. for Leave to File Fourth Amended Compl. at 6, Doc. No. 44.)

Having been briefed by the parties, these issues are now ripe for the Court's review.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court

7

weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' —that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 Fed. App'x. 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    DISCUSSION[1]

Remaining for the Court's consideration are two of Plaintiffs' claims:  (1) a breach of contract claim against Defendants for their alleged improper termination of the Contract, and (2) a claim that Defendants breached the implied covenant of good faith and fair dealing by "using the flimsiest of pretenses to avoid purchasing a building that it only reluctantly agreed to buy in order to obtain the parking spaces."  (See Compl. XX; see also Op. on Mot. to Dismiss (limiting Plaintiffs' breach of contract claims).)  Defendants move for summary judgment on both Counts.  Plaintiffs have filed two motions:  one for an extension of time to complete discovery and one for partial summary judgment.  Because the parties have completed discovery since Plaintiffs filed their first motion, and in light of their subsequent motion for summary judgment, Plaintiffs' motion for an extension of time is **DENIED AS MOOT**.  As such, the Court will review the parties' motions with respect to each of Plaintiffs' claims.

### A.  Count Two (Breach of the Covenant of Good Faith and Fair Dealing)

Plaintiffs have not contested Defendant's motion for summary judgment on Plaintiffs' claim alleging Defendants breached the covenant of good faith and fair dealing.  Plaintiffs also have not provided evidence from which a jury could conclude that Defendant's acted in bad faith due to a disingenuous intent to purchase the Property.  To succeed on this claim, some evidence of Defendant's improper intent is required.  See Elliott & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312 (2006) (affirming summary judgment in the absence of facts demonstrating improper motive because "an allegation of bad faith or unfair dealing should not be permitted to advance in the abstract and absent improper motive" (quoting Wilson v. Amerada Hess Corp., 773 A.2d

---

[1] As explained in the Court's Opinion granting-in-part and denying-in-part Defendant's 12(b)(6) motion, New Jersey law governs the parties' contractual dispute. (See Doc. No. 21.)

1121, 1130 (N.J. 2001))).  Indeed, Plaintiffs' own motion for summary judgment makes no mention of this claim.

As such, the Court finds summary judgment appropriate on Plaintiffs' Count alleging Defendant's breached their duty of good faith and fair dealing and will therefore grant Defendant's motion on this claim.  See Gould v. Beard, No. CA 07-55 ERIE, 2010 WL 845566, at *3 (W.D. Pa. Jan. 16, 2010) report and recommendation adopted in part, No. CIV.A 07-55 ERIE, 2010 WL 845389 (W.D. Pa. Mar. 3, 2010) ("If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

**B. Count One (Breach of Contract)**

Both parties move for summary judgment on Plaintiffs' breach of contract claim.  To succeed on a breach of contract claim, a plaintiff must demonstrate that "(1) a contract existed between plaintiff and defendant, (2) a breach of that contract, (3) damages flowing therefrom, and (4) that the party stating the claim performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) (citing Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp. 2d 543, 566 (D.N.J. 2003)); see also Model Civil Jury Instructions, § 4.10A, *available at* https://www.judiciary.state.nj.us/civil/charges/4.10A.pdf (establishing the four elements a plaintiff must prove to bring a successful breach of contract claim).  Defendant essentially contends that Plaintiffs have failed to satisfy their burden with respect to elements two and four.  It argues that Plaintiffs did not perform their obligations under the contract and, in fact, materially breached the contract by "by insisting upon revised appraisals and then by refusing to accept the agreed-upon purchase price and proceeding to closing."  (Def.'s Br. 10.)  Defendant, therefore, argues that its termination was within its rights under the Contract.  Thus,

the Court considers whether Plaintiffs have offered specific facts establishing all of the elements of their breach of contract claim or whether there is a genuine issue for trial.

The parties do not dispute that a contract existed between them. They do, however, dispute whether their respective conduct is considered a material breach under the contract. Defendants argue that Plaintiffs materially breached the Contract by failing to adhere to the appraisal process and refusing to purchase the Property at the price determined by the appraisers. Unsurprisingly, Plaintiffs argue their conduct was not in breach of the contract and that therefore Defendant's termination was improper and in breach of the contract.

In determining whether Plaintiffs could contest the appraiser's valuations without breaching the contract, the Court must consider the plain language of the contract, as well as "the situation of the parties, the operative usages and practices, and the objects the parties were striving to achieve." See George M. Brewster & Son, Inc. v. Catalytic Constr. Co., 109 A.2d 805, 811 (1954). Here, the Contract is silent as to whether the parties could contest the appraisers' valuations, and, if so, how they were to do so. It also did not require the appraisers to consider any specific information in preparing the appraisals. Rather, the Contract required only that the appraisers be MAI-certified.

Defendant argues that the Contract's silence compels a finding that challenging the appraisals was disallowed. As support for this position, Defendants cite New Jersey precedent deeming appraisals to be similar to arbitration awards in that they can be contested through litigation only in limited circumstances. See Cap City Products Co., Inc. v. Louriero, 753 A.2d 1205 (N.J. Sup. Ct. App. Div. 2000) (applying in the context of appraisals the principal already applicable to arbitration awards, namely that they be vacated only on account of "egregious mistakes of law"); see also Cablevision of Oakland v. CK Bergen Holdings, No. C-159-12, 2014

11

WL 923226, at *5 (N.J. Sup. Ct. App. Div. Mar. 11, 2014) (declining to revisit an appraisal in light of the parties' agreement and the standard espoused in Cap City).

However, New Jersey courts have recognized, on at least one occasion, that parties operating under a contract do not relinquish all right to inquire into an appraiser's methods simply because the contract is silent on their ability to do.  In that instance, the court emphasized that "it cannot be seriously argued that the appraiser is entitled to determine fair market value by spinning a wheel and flipping a coin, or that the appraiser may consider less than all relevant evidence, or that no party could question a mathematical error in the appraiser's calculations." Leach v. Princeton Surgiplex, LLC, No. L–2465–09, 2014 WL 2436045, * 2 (N.J. Sup. Ct. App. Div. June 6, 2013).  Indeed, as the Court explained, such a situation would be antithetical to the implied covenant of good faith and fair dealing, which "spring[s] from the law's endeavor to fulfill contracting parties' reasonable expectations."  Id. at *3.  The fact that a *court* cannot evaluate the validity of an appraisal as a matter of law absent egregious error does not mandate that parties to a contract are also be foreclosed from raising concerns.

This Court agrees with the reasoning in Leach and finds it unreasonable to infer from the Contract's silence that the parties intended to waive all right to inquire as to the appraiser's methods no matter how incorrect or faulty the appraisals were.  Accordingly, the Court does not accept Defendant's position that Roth's February 15, 2008 email constituted a material breach of the Agreement warranting Defendant's immediate termination.  Neither Roth's email nor his subsequent letter to Romm conveyed that Plaintiffs would not purchase the Property at $1.1 million.  Both simply conveyed Plaintiffs' concerns over Romm's failure to consider information

that Plaintiffs apparently believed he was *required* to consider,[2] and then asked Romm to

consider the information in a revised appraisal or "*explain the reasons that these existing facts

were not taken into consideration.*"  (Def.'s Ex. G. at 2.)  Based on the language of the Contract

and the reasonable expectations of the parties, the Court determines that his request was not a

material breach of the parties' Contract.  As the Court indicated in Leach, it cannot be seriously

argued that the parties were required to accept the appraisers' valuations no matter how

deficient.[3]  Although it is quite possible that Plaintiffs would have been in breach of the

Agreement had they continued to refuse the purchase price *after* Romm explained that Plaintiff's

objections did not affect his valuation, Defendant did not give them an opportunity prior to

terminating the Agreement on its own.  As such, the Court finds that Plaintiff's conduct did not

violation the *express* provisions of the Contract and grants Plaintiff's motion for partial summary

judgment on this argument.

      However, Plaintiff's burden does not end there.  An essential element of Plaintiffs'

breach of contract claim requires that Plaintiffs' prove that they, too, performed their obligations

under the Contract.  See Frederico, 507 F.3d at 203.  These obligations include the express duties

contained in the contract's terms, as well as those obligations that are implied.  As indicated

supra, in every contract is an implied covenant of good faith and fair dealing.  See Sons of

Thunder, Inc. v. Borden, Inc., 690 A.3d 575, 587 (N.J. 1997) (cataloguing cases in which the

Supreme Court of New Jersey has held that such a covenant exists in every contract in New

Jersey).  This covenant enforces the general principal that "neither party shall do anything which

---

[2] Roth's letter to Romm on February 19, 2008 stated, "It is my understanding that under the USPAP Rule 1-5(A), the appraiser is required to analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal."  (Defs.' Ex. G.)

[3] This conclusion is further supported by the fact that Plaintiffs request led Romm to increase his appraisal by $10,000 because he found an error in his original appraisal.

will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Id. at 587. A party breaches the covenant "if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 288 (3d Cir. 2000) (citing Sons of Thunder, 690 A.2d at 589). In this context, if Plaintiffs did not perform their obligations under the contract in good faith, they cannot succeed on their breach of contract claim. See Frederico, 507 F.3d at 203; cf. Ramada Worldwide, Inc. v. Rip Management Group Corp., No. 07-1540, 2009 WL 1810733, at *5 (D.N.J. June 25, 2009) (considering that Plaintiff had acted in bad faith as the defendants' defense to the breach claim but ultimately rejecting it because Defendant had not made the "required showing of bad faith or ill motive").

Thus, even though the Court has concluded that Plaintiffs did not breach the express terms of the contract by questioning Romm's appraisal, the Court finds that material issues of fact still exist as to whether Plaintiffs discharged their duties throughout the appraisal process in good faith. Here, Defendants have provided multiple communications between Toneatto and Pasymowski concerning the appraisal process that took place *prior to* Defendant's termination, see Defs. Exs. D, I, K, and from which a jury certainly could determine that Toneatto was, in bad faith, improperly attempting to influence the appraisal process with the intent of "injuring the right of [Defendant] to receive the fruits of the contract." Sons of Thunder, 690 A.3d at 587. Although Toneatto attempts to clarify his intent in sending these emails, see generally, Toneatto Decl., a jury could very well find those excuses are nothing more than a pretext, particularly in light of some of the language contained in his emails. Moreover, "[t]o act in bad faith is a matter of subjective, wrongful intent: bad faith 'contemplates an element of intent to do wrong in some degree.'" Buck Consultants, Inc. v. Glenpointe Assoc., 217 Fed. App'x 142, at *9 (3d Cir. Feb.

14

9, 2007) (quoting <u>Browning v. Fidelity Trust Co.</u>, 250 F. 321, 325 (3d Cir. 1918)).  And, as both

the Supreme Court of New Jersey and the Third Circuit have recognized on multiple occasions,

"questions of intent are factual determinations that should not be made on a motion for summary

judgment." <u>Id.</u> (internal quotations and citations omitted); <u>McBarron v. Kipling Woods L.L.C.</u>,

838 A.2d 490, 492 (N.J. Sup. Ct. 2004) ("The cases are legion that caution against the use of

summary judgment to decide a case that turns on the intent and credibility of the parties." (citing

multiple New Jersey precedents)).

　　　　As such, the Court cannot grant in full either parties' motion for summary judgment in

light of the material issue of fact still present.  It is for a jury to determine whether Plaintiffs'

actions, prior to Defendant's termination, were undertaken in bad faith.  If they were, then

Plaintiffs cannot succeed on their breach of contract claim.  If they did not act in bad faith, then

Plaintiffs' prevail and a jury is to determine the proper amount of damages.

## IV.　　MOTION FOR SANCTIONS

　　　　Sanctions under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") "are

warranted only in the exceptional circumstances where a claim or motion is patently

unmeritorious or frivolous." <u>Goldenberg v. Indel, Inc.</u>, No. 09-5203, 2011 WL 1134454, at *2

(D.N.J. Mar. 25, 2011) (citing <u>Watson v. City of Salem</u>, 934 F. Supp. 643, 662 (D.N.J. 1995));

<u>see</u> <u>also</u> <u>Doering v. Union Cnty. Bd. of Chosen Freeholders</u>, 857 F.2d 191, 194 (3d Cir. 1988).

Indeed, the Third Circuit has recognized that Rule 11 sanctions should be imposed only in those

rare instances where the evident frivolousness of a claim or motion amounts to an "abuse [] of

the legal system." <u>Id.</u>

　　　　Here, Defendants allege that Plaintiffs' Third Amended Complaint violates Rule 11

because it sets forth knowingly false factual allegations.  (See Def.'s Br., Doc. No. 46.)

Defendants have complied with Rule 11's requirement that the motion be filed as a separate pleading[4] and with the "safe harbor" provision of Rule 11(c)(2).  Under that provision, a party cannot file a motion for sanctions until it first presents the motion to the offending party, and allows 21 days for the other party to withdraw or correct the challenged issue.  In re Schaefer Salt Recovery, Inc., 542 F.3f 90, 99 (3d Cir. 2008) (citing Fed. R. Civ. P. 11(c)(2)).

Defendant claims that Plaintiffs made the following false allegations: (1) Plaintiffs were willing to pay the $1.1 million for the property, (2) Defendants did not communicate with Plaintiffs after they initially defaulted, (3) Dranoff did not provide Plaintiffs with an opportunity to cure, and (4) Plaintiffs did not act in bad faith and were not attempting to manipulate the appraisal process.  (Def.'s Br. 3–4.)  These statements do not strike the Court as warranting sanctions.  Plaintiffs' allegation that they did not act in bad faith is their legal argument not a factual allegation, and although Defendant disagrees, they are free to make this type of argument in an adversarial proceeding.  The remaining allegations have since been clarified by Plaintiffs, and the Court does not believe that the allegations rise to the level of sanctionable conduct.  This is an adversarial proceeding with issues of fact remaining, and the Court will not impose

---

[4] Rule 11(b) provides as follows:

(b) REPRESENTATIONS TO THE COURT.  By presenting to the Court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

sanctions because the parties disagree on Plaintiffs' motives and their knowledge of communications between Defendant and Plaintiffs' former attorney.  As such, Defendant's Motion for Sanctions is **DENIED.**


V.      **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, plaintiffs' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, and Defendant's motion for sanctions is **DENIED.**  In addition, Plaintiffs' motion for an extension of time to complete discovery is **DENIED AS MOOT.**


Dated:  2/08/2016                              s/Robert B. Kugler
                                               ROBERT B. KUGLER
                                               United States District Judge

17